Filed 1/25/24 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PLANNING AND CONSERVATION LEAGUE et al., <br><br>          Plaintiffs and Appellants, <br>     v. <br><br> DEPARTMENT OF WATER RESOURCES, <br><br>          Defendant and Respondent; <br><br> THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., <br><br>          Interveners and Respondents. | C096304 <br><br> (Super. Ct. No. 34201980003053CUWMGD) |
| DEPARTMENT OF WATER RESOURCES, <br><br>          Plaintiff and Respondent, <br>     v. <br><br> CALIFORNIA WATER IMPACT NETWORK et al., <br>          Defendants and Appellants; <br><br> THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., <br><br>          Interveners and Respondents. | C096316 <br><br> (Super. Ct. No. 34201800246183CUPTGDS) |

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE et al., | C096384 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201980003047CUWMGDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING |
| THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., | |
| Interveners and Respondents. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 5, 2024, be modified as follows:

1. On page 10, the first sentence of the last paragraph, the word "following" is changed to "by" so the sentence reads:

   The department received numerous comments by the close of the review period.

2. On page 23, the last sentence on the page is deleted and the following is inserted in its place:

   Alliance provides insufficient information regarding the nature of the addendum and insufficient analysis to support its argument that the addendum is a reasonably foreseeable *consequence* of the amendments, as required in *Laurel Heights I, supra*, 47 Cal.3d at page 396.

The petitions for rehearing filed on January 16, 2024, by appellants California Water Impact Network et al. and January 19, 2024, by appellants North Coast Rivers Alliance et al. are denied.

2

There is no change in the judgment.


FOR THE COURT:


  /s/
MAURO, Acting P. J.


  /s/
MESIWALA, J.


  /s/
WISEMAN, J.*

---

\*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Sacramento County, Kevin R. Culhane, Judge. Affirmed.

Law Office of Roger B. Moore and Roger B. Moore for Plaintiffs and Appellants in case No. C096304.

Law Office of Adam Keats and Adam Keats; John Buse; Law Office of E. Robert Wright and E. Robert Wright for Defendants and Appellants California Water Impact Network, AquAlliance, California Sportfishing Protection Alliance, Center for Biological Diversity, Friends of the River, and Planning and Conservation League in case No. C096316.

Freeman Firm and Thomas H. Keeling; Law Office of Roger B. Moore and Roger B. Moore for Defendants and Appellants County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Butte, County of Plumas, Plumas County Flood Control and Water Conservation District, and Central Delta Water Agency in case No. C096316.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke and Jamey M.B. Volker for Plaintiffs and Appellants North Coast Rivers Alliance, Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Associations, San Francisco Crab Boat Owners Association, and Winnemem Wintu Tribe in case Nos. C096316 and C096384.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz, Ryan R. Hoffman, L. Elizabeth Sarine, and Janelle Smith, Deputy Attorneys General, for Defendant, Plaintiff, and Respondent Department of Water Resources.

Marcia L. Scully, John D. Schlotterbeck, and Robert C. Horton; Best Best & Krieger, Amy E. Hoyt and Miles Krieger; Redwine and Sherrill and Steven B. Abbott; J. Carlos Orellana; Hanson Bridgett and Adam Hofmann; Meyers Nave and Gregory J. Newmark; Amelia Minaberrigarai; Nossaman and Paul S. Weiland for Interveners and Respondents.

4

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PLANNING AND CONSERVATION LEAGUE et al., <br><br>     Plaintiffs and Appellants, <br>   v. <br><br> DEPARTMENT OF WATER RESOURCES, <br><br>     Defendant and Respondent; <br><br> THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., <br><br>     Interveners and Respondents. | C096304 <br><br> (Super. Ct. No. 34201980003053CUWMGDS) |
| DEPARTMENT OF WATER RESOURCES, <br><br>     Plaintiff and Respondent, <br>   v. <br><br> THE CALIFORNIA WATER IMPACT NETWORK et al., <br><br>     Defendants and Appellants; <br><br> THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., <br><br>     Interveners and Respondents. | C096316 <br><br> (Super. Ct. No. 34201800246183CUPTGDS) |

NORTH COAST RIVERS ALLIANCE et al.,

Plaintiffs and Appellants,

v.

DEPARTMENT OF WATER RESOURCES,

Defendant and Respondent;

THE METROPOLITAN WATER DISTRICT
OF SOUTHERN CALIFORNIA et al.,

Interveners and Respondents.

APPEAL from a judgment of the Superior Court of Sacramento County, Kevin R. Culhane, Judge. Affirmed.

Law Office of Roger B. Moore and Roger B. Moore for Plaintiffs and Appellants in No. C096304.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke and Jamey M.B. Volker for Plaintiffs and Appellants and for Defendants and Appellants North Coast Rivers Alliance, Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Associations, San Francisco Crab Boat Owners Association and Winnemem Wintu in Nos. C096316 and C096384.

Law Office of Adam Keats, Adam Keats; John Buse; Law Office of E. Robert Wright and E. Robert Wright for Defendants and Appellants California Water Impact Network, AquAlliance, California Sportfishing Protection Alliance, Center for Biological Diversity, Friends of the River and Planning and Conservation League.

Freeman Firm, Thomas H. Keeling; Law Office of Roger B. Moore and Roger B. Moore for Defendants and Appellants County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Butte, County of Plumas, Plumas County Flood Control and Water Conservation District and Central Delta Water Agency.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz, Ryan R. Hoffman, L. Elizabeth Sarine and Janelle Smith, Deputy Attorneys General, for Plaintiff and Respondent and for Defendant and Respondent Department of Water Resources.

Marcia L. Scully, John D. Schlotterbeck, Robert C. Horton; Best Best & Krieger, Amy E. Hoyt, Miles Krieger; Redwine and Sherrill, Steven B. Abbott; J. Carlos Orellana; Hanson Bridgett, Adam Hofmann; Meyers Nave, Gregory J. Newmark; Amelia Minaberrigarai; Nossaman and Paul S. Weiland for Interveners and Respondents.

This consolidated appeal presents another chapter in California's long and contentious water supply story. The case centers on the Department of Water Resources's (department) approval of amendments to long-term contracts with local government agencies that receive water through the State Water Project. The original contracts were executed in the 1960s with 75-year terms ending between 2035 and 2042. The amendments extend the contract terms to 2085 and make other changes to the contracts' financial provisions, including expanding the facilities listed as eligible for revenue bond financing.

After reviewing the amendments under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and determining they would not have an environmental impact, the department filed an action to validate the amendments. Several conservation groups and public agencies (collectively, appellants) either answered with affirmative defenses or brought separate actions challenging the amendments. In a coordinated proceeding, the trial court ruled in favor of the department.

Appellants contend the trial court erred. Specifically, they contend the amendments violate three laws: CEQA, the Sacramento-San Joaquin Delta Reform Act (Delta Reform Act), and the public trust doctrine. Some appellants contend validation is improper for additional reasons. We disagree and affirm the judgments.

3

FACTUAL AND PROCEDURAL BACKGROUND

I

California's Water Supply

The problems surrounding California's water supply are well-documented in California jurisprudence. The story is one of " 'uneven distribution of water resources' by region and season." (*San Diego County Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1131 (*San Diego County Water Authority*).) Precipitation varies widely from year to year, most of the precipitation occurs in the winter while demand is highest in the summer, and most of the rain and snow falls in the north while the highest demand for water arises in the south. (*Ibid*.) To address this water distribution problem, California has established an "extensive water supply system to store and move water where and when it is needed." (*Ibid*.) "This water supply system is managed by a network of agencies on federal, state, regional and local levels." (*Ibid*.) An important component of that system is the Sacramento-San Joaquin Delta (Delta).

II

The Delta

The Delta is formed by the confluence of the state's two largest rivers. (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 564 (*DWR Environmental Impact Cases*).) "The bounded area is roughly triangular, with Sacramento at the north, Vernalis at the south[,] and Pittsburg at the west." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 107; see Wat. Code, § 12220 [legal boundaries].)

The Delta is the "most valuable estuary and wetland ecosystem on the west coast of North and South America." (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1027.) It provides "habitat for a vast array of aquatic and terrestrial species [and] offers a wide variety of recreational activities." (*DWR Environmental Impact Cases,*

4

*supra*, 79 Cal.App.5th at p. 565.)  The Delta also "serves as the hub of California's water supply infrastructure."  (*Ibid*.)  On its southeast edge, a set of pumps for the State Water Project "extract[s] millions of acre-feet of water from the Delta and convey[s] it through a system of reservoirs and canals to other parts of the state" for primarily urban and agricultural uses.  (*Ibid*.)

Thus, the quality of water in the Delta is important to the state's water supply system, "to other water users in and around the Delta, and to the maintenance and enhancement of fish and wildlife in the Delta."  (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 694.)  "[H]uman modifications to the Delta have promoted California's economy, but they have also imperiled its ecological health.  The Delta is the only saltwater estuary in the world that is used as a conveyance system to deliver fresh water for export.  This creates substantial water supply and ecosystem conflicts."  (*Delta Stewardship Council Cases, supra*, 48 Cal.App.5th 1014, 1034.)[1]

III

The State Water Project

The State Water Project is one of "two great water projects aimed at addressing the state's 'fundamental water problem.' "  (*Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 182 (*Central Delta*).)[2]  In 1960, the

---

[1]     We deny California Water Impact Network, et al.'s (Network) request for judicial notice of two documents: (1) the United States Fish and Wildlife Service's proposed listing of the Delta longfin smelt as an endangered species under the federal Endangered Species Act of 1973; and (2) the California Department of Fish and Wildlife's 2022 Fall Midwater Trawl annual fish abundance and distribution summary.  These documents are unnecessary to our analysis.  (See *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6 (*Appel*).)

[2]     The other project is the Central Valley Project, which is operated by the United States Bureau of Reclamation under water rights permits from the State Water Resources Control Board.  (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1147.)  This project provides water storage and distribution to

5

voters approved a $1.75 billion general obligation bond measure to build the State Water Project by enacting the Burns Porter Act (Wat. Code, § 12930 et seq; Burns-Porter) and authorizing the sale of Burns-Porter bonds. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1170, 1172 (*Alameda County*).)

In 1967, the State Water Project began operations under the management of the department. (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 693.) The State Water Project " 'consists of a series of 21 dams and reservoirs, 5 power plants, and 16 pumping plants [that] stretch from Lake Oroville in Butte County to Lake Perris in Riverside County.' " (*San Diego County Water Authority, supra*, 12 Cal.App.5th at p. 1132.) Water from the State Water Project flows from the Feather River to the Sacramento River and then into the Delta, where it is lifted by the Delta Pumping Plant into the California Aqueduct that conveys it south. (*Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 903.)

Following an initial period of Burns-Porter bonds, State Water Project capital costs have been financed primarily through the issuance of revenue bonds authorized by the Central Valley Project Act. (O'Connor, Cal. Research Bur., Issue Summary: Financing the State Water Project (June 1994), pp. 10-11; see Stats. 1933, ch. 1042, § 18; Wat. Code, § 11700.) The Central Valley Project Act requires the department to adopt a resolution authorizing the issuance of bonds to obtain funds for purposes of the act. (Wat. Code, § 11701.) The department adopted a general bond resolution for State Water Project revenue bonds in 1986. (Department of Water Resources, Central Valley Project Water System Revenue Bonds, General Bond Resolution No. DWR-WS-1 (July 1, 1986).) The department has since adopted over 60 supplemental resolutions to the

---

California's Central Valley primarily for agricultural use. (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 840-841 (*Westlands*).)

general bond resolution, each authorizing a series of bonds for specific purposes, often for the capital costs of specific State Water Project facilities.

The permits to appropriate water for operation of the State Water Project were issued to the department in 1967. (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 693; State Wat. Resources Control Bd. Dec. Nos. 1275 (May 31, 1967) [1967 WL 6285] & 1291 (Nov. 30, 1967) [1967 WL 6269].) With those permits, the State Water Project delivers water to millions of residents from Napa Valley to San Diego and irrigates hundreds of thousands of acres of farmland each year. (*Central Delta, supra*, 69 Cal.App.5th at p. 182.) " 'Due to environmental concerns, . . . construction of the entire [State Water Project] has never been completed, resulting in the annual delivery of only about half of the 4.2 million acre-feet of water projected.' " (*Alameda County, supra*, at 213 Cal.App.4th p. 1171.)

IV

The State Water Project Contracts

Burns-Porter required the department to enter contracts for the sale, delivery or use of water made available by the State Water Project. (Wat. Code, § 12937, subd. (b).) The department currently has long-term contracts with 29 local government contractors. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 899 (*PCL v. DWR*) ["Key provisions in the initial long-term contracts are substantially the same"].) The contracts were executed in the 1960s with initial terms of 75 years ending between November 4, 2035, and August 31, 2042. (*Central Delta, supra*, 69 Cal.App.5th at pp. 182-183.)

Under the contracts, each contractor has participation rights in the State Water Project, including the right to receive a certain portion of available State Water Project supplies. "The amount of water available depends on rainfall, snowpack, runoff, reservoir capacity, pumping capacity, and regulatory and environmental restrictions." (*Central Delta, supra*, 69 Cal.App.5th at p. 183.) In return for those rights, the

7

contractors pay a proportional share of the costs of developing, operating, and maintaining the State Water Project regardless of the amount of water they receive. (*Ibid*.)  The contractors that receive water also make payments attributable to the amount received.  (*San Diego County Water Authority, supra*, 12 Cal.App.5th at p. 1133.)  These contractor payments pay for both project operating costs and the public bonds issued to build the system.  (*Ibid*.)

Attached to each contract is a table – "Table A" – setting forth the maximum annual amount of State Water Project water that the department will provide to each contractor if water is available.  (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 219 (*Castaic Lake*).)  We refer to this amount as the "Table A Amount."  Delivery of the full Table A Amount is not guaranteed.  (*Ibid*.)  In fact, reliable water supply from the State Water Project has typically been around half of the Table A Amount.  (*PCL v. DWR, supra*, 83 Cal.App.4th at p. 908, fn. 5.)  For this reason, the Table A Amounts are sometimes referred to as "paper water" as they exist only on paper.  (*Ibid*.)

The contracts also include a provision described as "the evergreen clause."  This clause allows a contractor to elect to receive continued service following the expiration of its contract term by providing written notice to the department at least six months before the term's end.  Such continued service includes service of water under the same physical conditions, at the same cost, and in annual amounts up to the Table A Amount.  Other terms of continued service not provided in the evergreen clause must be equitable, reasonable, and mutually agreed upon by the department and the contractor.  Nine contractors exercised this election as early as 2009, years in advance of their contract termination dates.

The contracts have been amended several times since their execution.  One of those amendments – the Water System Revenue Bond Amendment added in 1987– provides for the recovery of costs of constructing certain State Water Project facilities,

such as the North Bay Aqueduct and the Coastal Branch Aqueduct, as well as the costs of repair, additions, and betterments of those facilities and all other facilities existing as of January 1, 1987. The financing of those costs is made through revenue bonds issued by the department under the Central Valley Project Act.

V

The State Water Project Contract Amendments

Prompted by the evergreen clause notices, the department participated in several public negotiation sessions with the State Water Project contractors between May 2013 and June 2014. The negotiations resulted in an agreement in principle to extend the contracts to 2085 and make various changes to the contracts' financial provisions.

Proposed amendments to the contracts were presented to the Senate Natural Resources and Water Committee and the Joint Legislative Budget Committee in informational hearings on July 3, 2018, and September 11, 2018, respectively. The department explained that, because of the impending contract termination dates, it could sell bonds with maturity dates extending only 17 years, rather than the customary 30 years, and that this shorter repayment period would increase annual repayment costs to the contractors and other ratepayers with the potential for significant financial impacts. We generally refer to this issue as the debt compression problem. The department also indicated that many capital upgrades and repairs were needed to State Water Project facilities and would benefit from 30-year or longer bond funding. And the department stated that the amendments "modernized financial provisions of the contract[s] to address existing conditions rather than those that needed to be addressed in the 1960s['] era contracts."

There are eight amendments in total. Appellants focus on the amendment that extends the term of each contract to December 31, 2085 (the extension amendment). Among the remaining seven amendments, which we refer to as the financial amendments, appellants focus on the amendment that revises the definition of water system facilities

9

to: (1) eliminate the January 1, 1987 limitation on repairs, additions, and betterments; and (2) add capital projects when approved by the department and 80 percent of the affected contractors (the revenue bond amendment).[3]

VI

CEQA Review and Department Approval of the Amendments

The department prepared a draft Environmental Impact Report (EIR) for the amendments and circulated that report for public review and comment in 2016. The draft EIR concluded that the amendments would have no environmental impact because they would not "create new water management measures, alter the existing authority to build new or modify existing [State Water Project] facilities, or change water allocation provisions of the [c]ontracts." Because the amendments would not result in physical environmental impacts, the report also concluded that the amendments would have no cumulative impacts.

The department received numerous comments following the close of the review period. The comments concerned the department's identification of alternatives, the relationship of the amendments to an additional Delta conveyance, the State Water Project's compliance with regulatory requirements, and recirculation of the draft EIR, among other topics.

---

[3] The other financial amendments do the following: (1) increase the State Water Project's operating reserves from approximately $32 million to $150 million; (2) recast the charges imposed on contractors to be made primarily on a pay-as-you-go basis instead of the preexisting long-term amortization approach; (3) create a reinvestment account to provide funds to finance all or a portion of the capital costs of individual projects that are chargeable to the contractors; (4) create a support account to provide a source of funds to pay for non-chargeable expenditures where there are no other funds available for those costs; (5) provide for the closure of an existing State Water Facilities Capital Account; and (6) require the department to establish a finance committee with representatives from the department and contractors to make recommendations to the director of the department concerning the financial policies of the State Water Project.

The department responded to the comments in the final EIR and certified the final EIR on November 13, 2018. On December 11, 2018, the department approved the amendments under CEQA and determined that the project will not have a significant effect on the environment.

VII

The Department's Validation Action and the Related Lawsuits

On December 11, 2018, the department filed a validation action under Code of Civil Procedure section 860 and Government Code section 17700 to validate the amendments. A few weeks later, (1) North Coast Rivers Alliance, et al.,[4] (Alliance) filed a petition for writ of mandate and complaint for declaratory and injunctive relief alleging that the amendments violate CEQA, the Delta Reform Act, and the public trust doctrine; and (2) the Planning and Conservation League, et al.,[5] (League) filed a petition for writ of mandate alleging that the department failed to comply with CEQA in certifying the final EIR.

The following month, Network[6] and the County of San Joaquin, et al.,[7] (public agencies) filed answers in the validation action, alleging affirmative defenses and contesting validation. Many contractors filed answers in support of validation, including respondents Santa Clarita Valley Water Agency, Alameda County Flood Control and

---

[4] Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Association, San Francisco Crab Boat Owners Association, and the Winnemem Wintu Tribe.

[5] AquAlliance and California Sportfishing Protection Alliance.

[6] AquAlliance, California Sportfishing Protecting Alliance, Center for Biological Diversity, and Friends of the River.

[7] Counties Contra Costa, Solano, Yolo, Butte, and Plumas; Contra Costa County Water Agency, Plumas County Flood Control and Water Conservation District, and Central Delta Water Agency.

Water Conservation District, Zone 7, Alameda County Water District, and Santa Clara Valley Water District. Three contractors (Metropolitan Water District, Kern County Water Agency, and Coachella Valley Water District) filed motions to intervene in the Alliance and League actions.

The trial court granted the intervention motions and ordered related the validation action and the Alliance and League lawsuits. After conducting a merits hearing, the court issued a final statement of decision in March 2022 and entered judgment for the department in all three cases. Appellants timely appeal. The intervening contractors and certain answering contractors (collectively, intervening contractors) filed a joint respondent's brief in addition to the department's brief.

VIII

Possible Additional Delta Conveyance

Proposals to build an additional Delta conveyance date back to at least the 1960s. In 1965, a committee studying the Delta proposed the construction of a 43-mile-long peripheral canal beginning on the Sacramento River, moving south, skirting and bypassing the eastern edge of the Delta, and ending at pumping plants near Tracy. (Hundley, Jr., The Great Thirst: Californians and Water, 1770s-1990s (1992) p. 311.) Authority to construct the canal was granted in 1980, but the voters eliminated that authority through a referendum in 1982. (*Id*. at pp. 320, 328.)

In 2006, the department began working on another proposal for an additional Delta conveyance. (*DWR Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 565.) The original proposal was known as the Bay Delta Conservation Plan and consisted of a new water conveyance facility and a long-term habitat conservation plan for the greater Delta area. (*Ibid*.) The new facility would consist of two tunnels designed to divert water from the Sacramento River in the north Delta and convey it to the south Delta. (*Id*. at p. 566.) In response to comments to the draft EIR for the Bay Delta Conservation

12

Plan, the department replaced the plan with an alternative that decoupled the conservation elements.  (*Ibid*.)  We refer to this alternative as WaterFix.  (*Ibid*.)

In 2014, the department entered separate negotiations "for amending the [c]ontracts to confirm and supplement certain provisions for water management actions, including transfers and exchanges, and to address changes in financial provisions related [to] costs of California WaterFix."  The negotiations led to a separate non-binding " 'Agreement in Principle Concerning the State Water Project Water Supply Contract Amendments for Water Management and California WaterFix' " (2018 Water Management Agreement).

In 2017, a group of plaintiffs filed lawsuits challenging WaterFix.  (*DWR Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 567.)  While those lawsuits were pending, California's newly elected Governor announced he did not support a dual tunnel proposal and instead supported a single tunnel.  Following that announcement, the department decertified the EIR for WaterFix and rescinded the associated project approvals.[8]  (*Id*. at p. 568.)

DISCUSSION

I

CEQA

A.     *Generally*

CEQA is " ' "a comprehensive scheme designed to provide long-term protection to the environment." [Citation.]' " (*Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230, 285.)  It requires public agencies to undertake an environmental review of proposed projects that require discretionary approval.  (Pub.

---

[8]     We deny the department's request for judicial notice of a March 29, 2021 agreement in principle between the department and certain public water agencies on a Delta conveyance project.  This document is not necessary to our analysis.  (See *Appel, supra*, 214 Cal.App.4th at p. 342, fn. 6.)

Resources Code, § 21080, subd. (a).) The heart of CEQA lies in the EIR. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 (*Laurel Heights II*).) "[A] public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.]" (*Ibid*.)

When an EIR is required, the lead agency initially prepares a draft EIR. (Pub. Resources Code, § 21082.1.) Once the draft is completed, a comment period is provided for the public and interested parties. (Pub. Resources Code, §§ 21091, 21104, 21153.) While preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. (Pub. Resources Code, § 21092.5, subd. (a).) The last substantive step in the EIR review process is certification of the final EIR. (*Laurel Heights II, supra*, 6 Cal.4th at p. 1124.)

Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) However, our inquiry extends only to whether there was a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard,* at pp. 426-427, fn. omitted.) Therefore, we resolve the CEQA issues before us "by independently determining whether the administrative record demonstrates any legal error by the [department] and whether it contains substantial evidence to support the [department's] factual determinations." (*Id.* at p. 427.)

" 'This distinction between de novo review and substantial evidence review is often straightforward. A contention that an agency has, for example, provided an insufficient amount of time for public comment is subject to de novo review. And a contention that an agency's factual findings are wrong, as a different example, is subject

14

to substantial evidence review.  But questions about the relevant standard of review are not always so clear.'  [Citation.]  'This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating "informed agency decisionmaking and informed public participation." '  [Citations.]  Those types of 'inquir[ies] present[] a mixed question of law and fact' and are 'generally subject to independent review.'  [Citation.]  . . .  But if 'factual questions predominate, a more deferential standard is warranted.'  [Citation.]"  (*County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 159.)

Here, appellants make the following four CEQA claims: (1) the EIR's impact analysis is flawed; (2) the EIR's project definition is inaccurate and unstable; (3) the EIR did not properly consider alternatives; and (4) the department should have recirculated the draft EIR.  Because we find no merit to these claims, as discussed separately *post*, we do not address intervening contractors' contention that the amendments are not a project under CEQA.

B.    *Impact Analysis*

The department concluded that the amendments will not have a significant effect on the environment.  Appellants contend the department violated CEQA in reaching this conclusion.  Specifically, they claim the department:  (1) used the wrong baseline; (2) improperly segmented the amendments from related projects; and (3) failed to consider the direct, indirect, and cumulative impacts of extending the contracts and of related projects.  We address each contention separately.

1.    *Baseline*

Appellants contend the department used the wrong baseline in conducting its impact analysis.  For example, in League's and public agencies' views, the extension amendment will "prolong the [State Water Project's] continued diversions from the

15

water-scarce Delta for another half-century or more," but the EIR improperly treats those diversions as the environmental baseline. We disagree.

"To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315.) According to CEQA Guidelines section 15125,[9] the baseline must reflect the "physical conditions existing at the time [the] environmental analysis" begins. (*Communities,* at pp. 320, 323.) "Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular use and the physical impacts thereof are considered to be part of the existing environmental baseline." (*Westlands, supra*, 227 Cal.App.4th at p. 872.) This rule applies to renewal of a permit or other approval for an existing facility even though the facility and its operations have not been previously reviewed under CEQA. (See *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 561 (*Citizens*).)

For example, in *Citizens* , the court considered an EIR for renewal of a lease to operate a marine terminal. The terminal had been in use since 1902, and no CEQA study had examined its construction, operation, or improvements. (*Citizens, supra*, 202 Cal.App.4th pp. 554, 555.) The lead agency used the existing, actual use and operation of the terminal as the baseline. (*Id*. at p. 555.) The reviewing court upheld this baseline under CEQA. (*Id*. at pp. 558-559.) In doing so, the court rejected the argument that the

---

**9**      All future references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) developed by the Governor's Office of Planning and Research and adopted by California's Natural Resources Agency. (Pub. Resources Code, § 21083.) "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 (*Laurel Heights I.)*

approving agency could eliminate the current conditions by refusing the renewal, concluding that no statute or case supported such a revisionist approach. (*Id*. at pp. 560-561.)

The analysis and holding in *Citizens* apply here. The baseline is the environmental setting under the current contract conditions. We do not use a baseline that imagines a world in which the contracts are not in place. Only Network attempts to string together authorities to undermine this standard. Specifically, Network relies on (1) CEQA definitions and the overall purpose of an EIR and CEQA; (2) statements describing the condition of the Delta and the impact of State Water Project diversions on animal species from cases with no baseline discussion; and (3) two excerpts from inapposite federal cases.[10] Network also cites the section of the Guidelines under which a lead agency determines whether a project requires an EIR and the CEQA statute setting forth the required EIR contents. (Guidelines, § 15065; Pub. Resources Code, § 21100.) None of these authorities negates the baseline standard set forth in Guidelines section 15125 and *Citizens*. Network concedes that the environmental setting normally constitutes the baseline physical conditions but contends "this is not a normal situation." Yet Network does not elaborate on this argument or explain why this case is not parallel to that considered in *Citizens*.

Network also relies on *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165. There, the court considered a section of the Guidelines that provided a CEQA exemption for certain projects granted partial approval before a certain date. (*Id*. at p. 1218.) The court held that this section was invalid to the

---

**10**　One excerpt describes when an environmental impact statement is required under federal law (*Environmental Defense Fund, Inc. v. Andrus* (9th Cir. 1979) 596 F.2d 848, 852) and the other considers whether a lead agency adequately addressed cumulative impacts (*AquAlliance v. U. S. Bureau of Reclamation* (E.D. Cal. 2018) 287 F.Supp.3d 969, 1037).

extent it expanded a statutory CEQA exemption. (*Ibid*.) In a single sentence, Network contends we should reach the same result here. Thus, Network appears to advocate for us to declare Guidelines section 15125 invalid as outside CEQA and to refuse to follow *Citizens*. Network provides insufficient argument for us to reach such a conclusion. Network does not identify the CEQA statute that Guidelines section 15125 exceeds and fails to provide persuasive argument to reject *Citizens*. (See *California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544 [burden is on party challenging a regulation to show its invalidity]; *Arentz v. Blackshere* (1967) 248 Cal.App.2d 638, 640 [adopting rule from appellate court decision that "has stood without contradiction for seven years"]; *Wolfe v. Dublin Unified School Dist.* (1997) 56 Cal.App.4th 126, 137 ["we ordinarily follow the decisions of other districts without good reason to disagree"].)[11]

Lastly, Network contends adopting the contract conditions as the baseline violates the CEQA requirement that the EIR discuss any inconsistencies between the proposed project and general, specific, and regional plans. (See Guidelines, § 15125(d).) Network interprets this requirement to mean that the department was required to determine whether the amendments are consistent with "related regulatory regimes [such as the Delta Reform Act and the California Endangered Species Act] and the exacerbation of climate change, water supply and Delta crises." Network cites no authority to support such a broad construction of this provision, and we see no basis to furnish that authority. None of the regimes Network identifies are general or specific plans. (*Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1310 [a general plan is local legislation, and a specific plan covers specific parts of a

---

[11]    Network makes new arguments in its reply brief, extending over five pages, regarding *Asuza*. We have no duty to respond to arguments first raised in a reply brief. (*Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061, fn. 7.)

community].)  The only possible regional plan is the plan adopted under the Delta Reform Act, but that act has its own trigger for compliance which we discuss in detail in part II *post*.  In sum, we reject appellants' claim that the department used the wrong baseline.

2.     *Segmentation*

We next turn to the department's analysis of the impacts of the amendments compared to the baseline.  Alliance, League, and public agencies contend the department failed to consider other related projects in conducting the impact analysis and thereby adopted a truncated project description and engaged in improper segmentation in violation of CEQA.

Environmental review of a project under CEQA must encompass the whole of an action affecting the environment.  (Guidelines, § 15378, subd. (a).)  This means a lead agency may not chop "a large project into many little ones – each with a minimal potential impact on the environment – which cumulatively may have disastrous consequences." (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370.)  In *Laurel Heights I*, the California Supreme Court clarified that an EIR must include an analysis of the environmental effects of future expansion or other action that:  (1) is a reasonably foreseeable consequence of the initial project and (2) will likely change the scope or nature of the initial project or its environmental effects. (*Laurel Heights I, supra*, 47 Cal.3d at p. 396.)

As an initial matter, we reject Alliance's, League's, and public agencies' contentions that the *Laurel Heights I* test does not apply or that the trial court placed excessive reliance on that test.  They contend a more generalized "related to" test applies and requires the EIR to consider any projects that are merely related to the amendments. In support, they rely on a line of reasoning articulated in *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214 (*Tuolomne*).  If we construe that line of reasoning broadly, it suggests that two acts close in time and

location and undertaken by the same entity are more likely to be considered part of a larger whole. (*Id.* at p. 1227.) But courts have since construed cases relying on this logic as limited to their facts, finding improper piecemealing "when the reviewed project legally compels or practically presumes completion of another action." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1224 (*Banning*).)[12] No such compulsion or presumption is apparent or argued here.

That said, courts have applied *Laurel Heights I* to reach different conclusions. On the one hand, they have applied it to conclude that "a proposed project is part of a larger project for CEQA purposes if the proposed project is a crucial functional element of the larger project such that, without it, the larger project could not proceed." (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99.) For instance, there may be improper piecemealing when the purpose of the activity at issue is to be the first step or to provide a catalyst toward future development. (*Banning, supra*, 211 Cal.App.4th at p. 1223.)

On the other hand, courts have distinguished these "first step" cases where the project under consideration is only a baby step toward another project. (*Banning, supra*, 211 Cal.App.4th at p. 1225.) For example, in *Banning*, the court concluded that an access road to a park was "only a baby step toward [a housing] project" that would use the same access road and certainly "a much smaller step than the reviewed actions in the 'first step' cases." (*Id.* at pp. 1225-1226.) In a related context, the court in *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266 considered a county's negative declaration for an ordinance that changed hotel zoning rules regarding

---

[12] For example, in *Tuolumne*, the court determined that a city improperly piecemealed review of construction of a shopping center from the widening of a street because the street widening was a condition precedent to the shopping center. (*Tuolumne, supra*, 155 Cal.App.4th at p. 1226.)

permissible density, height, and parking. (*Id*. at p. 274.) The county's planning department found that the ordinance would have no significant environmental impact because future developments would be subject to further discretionary approval. (*Id*. at pp. 275, 286.) The appellant argued this finding improperly deferred an analysis of future impacts to the future when they are presently reasonably foreseeable. (*Id*. at p. 286.) The reviewing court disagreed. Distinguishing the "first step" cases and applying the *Laurel Heights I* test, the court held that the county was not required to consider the impact of future developments even though the ordinance created incentives for such development because it was unclear whether the ordinance would in fact induce future development. (*Id*. at pp. 290-295.)

Courts have also applied *Laurel Heights I* to conclude that "two projects may properly undergo separate environmental review . . . when the projects have different proponents, serve different purposes, or can be implemented independently." (*Banning, supra*, 211 Cal.App.4th at p. 1223.) For example, in *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, the Department of Transportation (Caltrans) proposed to build a highway that would form part of the state highway system, and a city joined Caltrans in planning a segment of the highway within the city's jurisdiction. (*Id*. at pp. 720-721.) When funding issues and other problems hindered the highway's development, the city certified an EIR for the highway segment. (*Id*. at pp. 721-725.) The appellate court concluded that the EIR did not constitute improper piecemealing because the highway segment had substantial independent utility from the full highway and because uncertainties existed regarding completion of the highway. (*Id*. at pp. 736-737.)

Here, Alliance, League, and public agencies contend the department improperly piecemealed a Delta conveyance from the amendments. We accept that some evidence in the record suggests the amendments may fall in the "first step" category described in *Banning, supra*, 211 Cal.App.4th at page 1223. At the joint legislative oversight hearing

21

regarding the amendments, the director of the department testified that the amendments would be used to help finance WaterFix. She further explained that when a separate WaterFix amendment is in place, that amendment would take advantage of the contract extension and the ability to issue long-term revenue bonds as a mechanism to finance WaterFix. At the same hearing, a representative from the non-partisan Legislative Analyst's Office stated that the extension and revenue bond amendments were essential for a Delta conveyance project to go forward.[13] However, on independent review of the record, we conclude that the amendments fit better in the no piecemealing category. (See *Banning, supra*, 211 Cal.App.4th at p. 1225.)

The record indicates that the amendments serve an independent purpose from a Delta conveyance. At the joint legislative oversight hearing, the Legislative Analyst's Office representative confirmed that the amendments are necessary for the existing operations of the State Water Project regardless of whether WaterFix goes forward. The EIR provides evidence of the bond compression problem, namely that contractors will experience a sharp increase in capital charges because of shorter bond repayment periods necessitated by the looming contract termination dates, and that the extension amendment will reduce those charges. Similarly, the evidence shows that the revenue bond amendment serves a broader purpose than providing a financing mechanism for a Delta conveyance: The department provided a lengthy list of projects for existing State Water Project facilities that may use that mechanism to obtain funding. Even if viewed as a necessary step toward financing a Delta conveyance project, the revenue bond amendment is a distant step toward several other hurdles facing such a project. The history of an additional Delta conveyance, as discussed *ante*, indicates that such a conveyance lacks certainty and would require an enormous undertaking. In sum,

---

[13] Environmental groups and other entities raised similar concerns both at the oversight hearing and in response to the draft EIR.

considering the amendments and an additional, uncertain Delta conveyance as a single project under CEQA stretches the term "project" too far.

We also reject Alliance and public agencies' contention that the EIR was improperly piecemealed from the following: (1) an addendum to a coordinated operations agreement that the department negotiated with the United States Bureau of Reclamation in 2018 (coordinated operations addendum); (2) the 2018 Water Management Agreement; and (3) the department's 2020 EIR for State Water Project Long-Term Operations.

As to the coordinated operations addendum, the draft EIR acknowledges the underlying agreement and describes it as (1) governing the coordinated operations of the Central Valley Project and State Water Project in the Sacramento River watershed and the Bay-Delta, (2) coordinating operations between the Central Valley Project and the State Water Project, and (3) providing for equitable sharing of surplus water entering the Bay-Delta. Alliance contends the department was negotiating an addendum to the agreement at the same time it was reviewing the amendments and that the department approved the addendum one day after approving the amendments. Relying on this temporal closeness, Alliance claims that the EIR should have considered the impact of the addendum on the amendments. We reject this bare claim that the timing of the addendum and the amendments renders them the same project under CEQA. Alliance cites no evidence in the record regarding the addendum and insufficient analysis to support its argument that the addendum is a reasonably foreseeable *consequence* of the amendments, as required in *Laurel Heights I, supra*, 47 Cal.3d at page 396.[14] Alliance's

---

[14] The trial court also declined to analyze the Alliance's segmentation argument as to the coordinated operations addendum because Alliance did not cite or submit evidence concerning the addendum, including its scope or purpose.

contention is therefore forfeited. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656 (*Keyes*).)

The same defect appears in Alliance's and public agencies' concerns regarding the 2018 Water Management Agreement and the department's "parallel review of [State Water Project] Long-Term Operations on March 27, 2020." Alliance and public agencies contend the department should have considered these items alongside the amendments, but they provide no evidence or discussion of their nature. Moreover, they provide no analysis to support their piecemealing argument as to these items, relying again on temporal closeness and a general connection to the State Water Project. This contention is also forfeited. (*Keyes, supra*, 189 Cal.App.4th at pp. 655-656.)

### 3. *Direct, Indirect, and Cumulative Impacts*

An EIR's analysis of significant environmental impacts must identify and describe the significant direct or indirect environmental impacts that will result from the project in both the short term and long term. (Guidelines, § 15126.2, subd. (a).) A direct impact occurs at the same time and place as the project and is a change in the physical environment *caused* by the project. (Guidelines, §§ 15064, subd. (d)(1), 15358, subd. (a)(1).) An indirect impact is *caused* indirectly by the project, occurs later in time (or farther removed in distance), and is a reasonably foreseeable impact of the project. (Guidelines, §§ 15064, subd. (d), 15358, subd. (a)(2).)

Appellants contend the department was required to consider the impacts of an additional 50 years of existing State Water Project operations. Because we uphold the department's baseline, this contention lacks merit. Ongoing activities at the project site at the time of CEQA review are treated as a component of the existing conditions baseline. (*Citizens, supra*, 202 Cal.App.4th at pp. 559, 560.) "This baseline principle means that a proposal to continue existing operations without change would generally have no cognizable impact under CEQA." (*Westlands, supra*, 227 Cal.App.4th at pp. 872-873.) As applied here, this baseline principle means the existing State Water

Project operations are part of the baseline and are not impacts of the amendments. (See *Citizens, supra*, 202 Cal.App.4th at p. 566 [water discharges were not effects of a project because they were reflected in the baseline].)

For different reasons, we reject League and public agencies' claim that the department should have analyzed the direct and indirect impacts of facilitating a Delta conveyance project. League and public agencies contend overwhelming evidence supports the conclusion that the amendments facilitate an additional Delta conveyance, citing statements from various entities concerning the Bay Delta Conservation Plan, comment letters submitted to the draft EIR, news articles, and materials and testimony from the legislative oversight hearings, among other things. But League and public agencies provide no argument linking this evidence or their analysis of it to authorities. These contentions ultimately fail for the same reason the segmentation argument fails as to a Delta conveyance. Whether a Delta conveyance will occur in the future is speculative as to both its timing and scope, and lead agencies are not required to speculate regarding potential impacts. (See Guidelines, § 15145; *Rio Vista Farm Bureau Center v. County of Solano, supra*, 5 Cal.App.4th at p 372 ["[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences."].)

Alliance also argues that the department failed to closely examine the impacts of the coordinated operations addendum and the 2018 Water Management Amendments. As stated in B.2 *ante*, Alliance's contention is forfeited. (See *Keyes, supra*, 189 Cal.App.4th at pp. 655-656.)

League and public agencies also appear to contend the department should have analyzed the impacts of the "capital projects [the department] says it wishes to fund through the Amendments," referencing the Oroville hydroelectric license project and obtaining a Federal Energy Regulatory Commission license. They appear to argue those impacts are direct, indirect, or cumulative effects of the amendments. But they provide

no further discussion of these projects or analysis as to why the environmental effects of them must be included as impacts of the amendments. For this reason alone, their contention is forfeited. (See *Keyes, supra*, 189 Cal.App.4th at pp. 655-656.)

Also, we find no merit in League's and public agencies' contentions. Direct or indirect impacts must be *caused* by the project (Guidelines, § 15358, subd. (a).), and cumulative impacts do not include impacts of future action " 'that is merely contemplated or a gleam in [the] planner's eye' " (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1271-1272). In the draft EIR, the department stated that the amendments would provide long-term benefits to the State Water Project including the ability to continue to finance repairs to existing State Water Project facilities like repairs to the California Aqueduct and replacement of aging pumps, generators, and other equipment. The department also stated that the sale of longer-term bonds could finance capital projects, including reinforcing Perris Dam, reconstructing the Ronald B. Robie Thermalito pump-generating plant, implementing the Oroville hydroelectric license project, and obtaining a renewed Federal Energy Regulatory Commission license for existing facilities. Under League's and public agencies' views, the department would be required to forecast the impacts of the entirety of these projects in its EIR for the amendments. This view is untenable. And it is undermined by CEQA's exclusion of review of projects that create "government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment." (Guidelines, § 15378, subd. (b)(4).) While the projects appear to be on a department "to-do list" as part of its role in operating the State Water Project, the link between them and the amendments is too attenuated. The amendments do not commit the department to these projects, the amendments do not authorize revenue bonds for any projects (which requires a resolution), and the projects are not caused by the amendments.

26

Lastly, we reject League's and public agencies' contentions that deferring review of projects to be funded in the future with bonds under the amendment is improper under CEQA. This contention reads as follows, "CEQA applies to the first agency decision, even if other steps remain. [Citation.] To hold otherwise would defeat CEQA's goal of 'transparency' and the EIR's role as a 'document of accountability,' making any later EIR 'a document of post-hoc rationalization.' [Citation.]" We disregard this two-sentence contention because it is not supported by pertinent legal authority or analysis. (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [ disregarding " 'conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "].)

Specific to cumulative impacts, an EIR must discuss cumulative impacts when those impacts are significant, and the project's incremental contribution is cumulatively considerable. (Guidelines, § 15130, subd. (a).) A project's incremental contribution is cumulatively considerable if the incremental effects[15] of the project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects. (Guidelines, § 15065, subd. (a)(3).) Here, the department determined that "implementation of the [amendments] would not result in physical environmental impacts; therefore, it would not contribute to any cumulative effect . . . ." Public agencies, Alliance, and League do not contest the underlying principle that a project with no environmental impact has no cumulative impact. Their objection to the department's cumulative impact analysis relies on their segmentation arguments or contests the department's underlying conclusion that the

---

**15**     Under CEQA, "effects" must be related to a physical change. (Guidelines, § 15358, subd. (b).)

27

amendments will not result in physical environmental impacts.  Given our conclusions *ante*, such objections lack merit.

C.      *Project Description*

An EIR must contain an accurate and stable project description.  (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 673 (*Save Our Capitol!*).)  The description must include the project's precise location and boundaries; a statement of the project's objectives and underlying purpose; a general description of the project's technical, economic, and environmental characteristics; and a statement description the EIR's intended use.  (Guidelines, § 15124, subds. (a)-(d).)  Whether the EIR contains an accurate and stable project description is a question of law subject to de novo review.  (*Save Our Capitol!* at p. 673.) League and public agencies contend the EIR project description violates CEQA for three reasons.  We conclude none have merit.

First, according to League and public agencies, the final EIR portrays the project as separate and independent from the department's Delta conveyance project, but such portrayal is inconsistent with what the department presented in early stages of project review.  In support, League and public agencies cite various documents in the record with no analysis as to how the contents of those documents support their position.  Our review of the identified records does not reveal the inconsistency League and public agencies suggest.

Second, League and public agencies take issue with the EIR's identification of the 2085 extension date.  They claim the department failed to disclose its expectation that the contracts would be extended for successive periods under the evergreen clause even without this amendment.  Again, these claims lack sufficient analysis and authority.  Also, the record supports the lack of parity between applying the evergreen clause to individual contracts and obtaining a long-term extension across the pool of contractors.  Thus, we perceive no need for the department to liken the extension to evergreen clause elections.

And third, League and public agencies find fault with the EIR's assertion that the project will not alter the existing authority to build new or modify existing facilities of the current contracts. They claim this assertion is inaccurate because the EIR fails to disclose the elimination of the restriction on revenue bond eligibility for new facilities and its expansion of facilities eligible to be financed with revenue bonds. We disagree. The project description portion of the EIR describes this amendment as providing enhanced funding mechanisms and goes on to detail the precise revisions. We see no inaccuracy in these descriptions.

D.      *Alternatives*

An EIR must identify and discuss a range of alternatives to the proposed project, including a no-project alternative. (Guidelines, § 15126.6, subds. (a), (e)(1).) Appellants claim the department did not present a reasonable range of alternatives. They separately claim the department's no-project alternative failed to comply with CEQA. We address the range of alternatives claim first.

1.      *Range of Alternatives*

A lead agency begins the EIR process by determining the project's purpose and objectives. (Guidelines, § 15124, subd. (b).) An EIR must describe a range of reasonable alternatives to a project that would feasibly attain most of the project's basic objectives while avoiding or substantially lessening any of the project's significant effects. (Guidelines, § 15126.6, subd. (a).)

Here, the department listed the following objectives for the amendments: ensuring the department can finance State Water Project expenditures beyond 2035 for a sufficiently extended period to provide for a reliable stream of revenue from the contractors and to facilitate ongoing financial planning for the State Water Project; maintaining an appropriate level of reserves and funds to meet ongoing financial State Water Project needs and purposes; simplifying the State Water Project billing process;

29

and increasing coordination between the department and the contractors regarding State Water Project financial matters.

The department considered a total of seven alternatives to the amendments. The first six were the following: (1) not implementing the amendments (the no-project alternative discussed *post*); (2) implementing a shorter contract extension with the financial amendments; (3) implementing a longer contract extension with the financial amendments; (4) extending the contract term to 2085 but excluding the financial amendments (the extension-only alternative); (5) extending the contract term to 2085 but delaying implementation of the financial amendments until 2035; and (6) selling bonds with maturity dates extending beyond the current contract expiration dates, thereby extending the contract term to the latest maturity date of the bonds sold. The seventh alternative was one in which not all contractors sign the amendments. The department also considered but rejected the following two alternatives: (1) an alternative that would have reduced Table A Amounts under the contracts; and (2) an alternative that would have implemented new water conservation management provisions. Appellants contend the department's consideration of all of these alternatives violated CEQA in three ways.

First, Alliance makes the one-sentence statement that "[n]one of these [a]lternatives are sufficiently different from the [amendments] to provide a reasonable range of alternatives under CEQA." But Alliance offers no citation to authority or analysis to support this statement. We defer to the department's selection of alternatives unless Alliance (1) demonstrates the alternatives are manifestly unreasonable and do not contribute to a reasonable range of alternatives and (2) identifies evidence of a potentially feasible alternative that meets most of the basic project objectives. (*Save Our Access etc. v. Watershed Conservation Authority* (2021) 68 Cal.App.5th 8, 32.) Alliance's one-sentence statement does not meet this standard.

Second, League and public agencies take issue with the department's omission of an alternative that excluded only the revenue bond amendment. They contend this

30

amendment creates "new risks of potentially limitless debt for a Delta conveyance or other costly new facilities." But "CEQA is not an economic protection statute." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 903.) Thus, economic effects alone are not treated as significant effects on the environment under CEQA. (Guidelines, § 15064, subd. (e).) Also, an EIR need not consider every conceivable alternative. (Guidelines, § 15126.6, subd. (a).) The EIR must " 'set forth only those alternatives necessary to permit a reasoned choice' and . . . 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163.) "When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 355.) Here, exclusion of the revenue bond amendment can be understood from the specifics of the no-project alternative and the extension-only alternative. (See *id.* at pp. 354-356.)

And third, appellants challenge the department's rejection of the alternative to reduce Table A Amounts and the alternative to implement new water conservation management provisions. They argue these alternatives would have lessened the environmental impacts of the amendments and better aligned with other state law requirements. But appellants do not discuss how these alternatives would have addressed the problems the department set out to solve. "When an agency has deliberately limited the scope and nature of the problem that it wants to solve, the agency should not be required to consider alternatives that address a much bigger problem [citation] or that add difficult issues the agency has chosen not to tackle [citation]." (*Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 673, review granted May 17, 2023, S279242.) Here, the department adopted a program EIR for the limited purpose of addressing financial issues with respect to the State Water Project

contracts and made a reasoned decision to exclude Table A Amounts from the scope of the project. (See *Good Neighbor* at p. 673.) Given the complexity of, and competing interests, in Table A Amounts and conservation measures, the department would presumably need to add objectives to the EIR to develop alternatives to any Table A reductions or conservation measures. (*Ibid*.) As in *Good Neighbor*, appellants do not contend the department's objectives were impermissibly narrow by not considering alternatives that address a bigger issue, such as, in this case, Table A Amount reductions or conservation measures. (*Id*. at p. 674; see, e.g., *We Advocate Thorough Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683, 691 (*We Advocate*).)

In sum, appellants demonstrate no reversible error under CEQA as to the department's range of alternatives.

2. *No-Project Alternative*

In addition to discussing a range of alternatives to a proposed project, an EIR must discuss a no-project alternative. (Guidelines, § 15126.6, subds. (a), (e).) The purpose of that alternative is to provide a comparison of the environmental impacts that would result if the project is not approved with those that would occur if the project is approved. (Guidelines, § 15126.6, subd. (e)(1).)

Under the department's no-project alternative, the department and the State Water Project contractors "would continue to operate and finance the [State Water Project] under the [c]ontracts to December 31, 2035" and the terms of the contracts would be extended beyond their current expiration dates under the evergreen clause of each contract. In this scenario, water service would continue beyond 2035 to all contractors consistent with the contracts' existing financial provisions, the department would not sell bonds with maturity dates past 2035, and the debt compression problem would be exacerbated. The department determined that this alternative, like the amendments, "would not result in any direct physical environmental impact[] because it would not create new water management measures, alter the existing authority to build new or

32

modify existing facilities, or change water allocation provisions of the current [c]ontracts."

Appellants argue this alternative fails to comply with CEQA. Although they make slightly different arguments, they all appear to contend the department should have considered the scenario in which the contracts are allowed to expire. They further contend reliance on the evergreen clause is improper because applying that clause (1) is a project in itself and may not comply with other applicable laws; (2) does not guarantee all provisions of the existing contracts will be extended; and (3) does not account for other future changes to the State Water Project that the department has acknowledged elsewhere. League and public agencies also contend the department's forecast violates CEQA because the difference between that forecast and the amendments is blurred; as a result, the department's no-project analysis fails to provide a straightforward analysis and factually based forecast of proceeding with the status quo. They assert that the department's financial model showing the financial differences between the amendments and no project is defective because the model is "merely based on . . .extending the period for water deliveries, which would not require the amendments." Appellants' contentions are unpersuasive.

The no-project analysis must discuss the existing conditions as well as what would be reasonably expected to occur in the foreseeable future if the project is not approved based on current plans and consistent with available infrastructure. (Guidelines, § 15126.6, subd. (e)(2).) In reviewing a no-project alternative, " '[o]ur task is extraordinarily limited and our focus is narrow. Did the EIR adequately describe the existing conditions and offer a plausible vision of the foreseeable future?' " (*Central Delta, supra*, 69 Cal.App.5th at p. 199.) The no-project alternative "is a factually based forecast of the environmental impacts of preserving the status quo." (*PCL v. DWR, supra*, 83 Cal.App.4th at p. 917.) "Where the EIR is reviewing an existing operation or changes to that operation, the no project alternative is the existing operation." (*Center for*

33

*Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 253.) We affirm the department's factually based forecast as to what constitutes the no-project condition if we find substantial evidence to support it. (*We Advocate, supra*, 78 Cal.App.5th at p. 693.) Substantial evidence includes facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts. (Pub. Resources Code, § 21082.2, subd. (c); Guidelines, § 15384, subd. (b).)

Here, after reviewing the EIR in detail, we conclude the difference between the amendment and the no-project alternative is sufficiently intelligible. We disagree with League's and public agencies' descriptions of the financial model: The model explains that the bond debt financing period is limited to the number of years remaining on the contract. We also conclude that the department offered a plausible vision of a future in which the amendments are not approved. Given the long history of the State Water Project and its critical role in distributing water to millions of residents in the state and hundreds of thousands of acres of farmland, the department was not required to envision a world in which the contracts terminate and the State Water Project comes to a halt. The department's forecast was based on the long-term investment contractors have made in the State Water Project facilities and the reliance of their communities on the water provided through the State Water Project. Thus, it is reasonably foreseeable that the contractors would extend the terms of their contracts through the evergreen clause.

Appellants' focus on whether all terms of the contracts would be extended as to each contractor takes the no-project alternative into speculation. (Guidelines, § 15126.6 subd. (f)(3).) "[A]n EIR is not obliged to examine 'every conceivable variation' of the 'no project' alternative." (*Castaic Lake, supra*, 180 Cal.App.4th at p. 246.) The same is true of Alliance's cursory argument that the department failed to account for "the likely changes to [State Water Project] operations that [the department] has acknowledged elsewhere." This argument lacks sufficient analysis, citing only to an EIR comment letter with piecemeal citations to various reports, and would require the department to engage

34

in layers of speculation and produce wide varieties of no-project alternatives. League's argument that the department should have confronted the foreseeable need to reduce water deliveries from the Delta fares no better. The no-project alternative is the status quo and is not required to assume that the state will solve its great water problem and find a way to reduce State Water Project water deliveries.

Finally, League and public agencies argue the department failed to provide an analysis of the effects of not pursuing the revenue bond amendment. In their view, the department should have analyzed the environmental advantage of not facilitating the expansion of the State Water Project. They liken this situation to that considered in *PCL v. DWR, supra*, 83 Cal.App.4th 892. But that case is inapposite. There, the reviewing court considered an amendment to the State Water Project contracts that settled disputes arising under the contracts' temporary and permanent water shortage provisions. The amendments renegotiated the temporary provisions and eliminated the permanent provisions. (*Id*. at p. 908.) The court concluded the department's no-project alternative failed to consider the foreseeable environmental consequences of retaining the permanent shortage provisions. (*Id*. at p. 915.) Thus, the department failed to provide a thorough examination of the no-project alternative. (*Id*. at p. 916.)

The facts in *PCL v. DWR* do not resemble ours. Here, the department did consider the foreseeable consequences of not implementing a revenue bond amendment. The EIR states that the "no project alternative will likely result in further delay in [DWR's ability] to sell revenue bonds beyond 2035 to fund needed repairs and improvements to existing facilities and to fund the construction and acquisition of new facilities. . . .[¶] Impacts associated with deferred operation and maintenance and major construction are speculative at this time as it is unknown how deferred maintenance and repair would affect State Water Project facilities and, in turn, affect State Water Project water service. . . . Nevertheless, it is reasonable to assume that the indirect impacts of this alternative would likely be greater than the impacts of the proposed project." This is a

35

sufficient forecast of not implementing the revenue bond amendment. League and public agencies' concern is not that the department failed to examine the effects of not pursuing this amendment, but rather that the department attributed no environmental effects to that aspect of the no-project alternative. This concern assumes the revenue bond amendment will have an environmental impact but as discussed in B.2. *ante*, we disagree with the argument underlying that assumption.

E.    *Recirculation of the EIR*

"CEQA requires a lead agency to recirculate an EIR for public comment and consultation with other agencies when it adds 'significant new information' to the final EIR before certifying it. Not recirculating such information deprives the public of a meaningful opportunity to comment on the new information." (*Save Our Capitol!, supra*, 87 Cal.App.5th at pp. 705-706; see also Pub. Resources Code, § 21092.1.) League and public agencies contend the department failed to satisfy this requirement. We disagree.

"We presume the agency's decision [not to recirculate] is correct. [The appellants] bear the burden of showing that no substantial evidence supports [the department's] determination that the new information. . .was not significant." (*Save Our Capitol!, supra*, 87 Cal.App.5th at p. 707.) League and public agencies do not provide record citations showing new information that was added to the final EIR. While the department admitted in the final EIR that new information had been added, it is the challenging party's job to point out that new information and provide an analysis of its significance. (See, e.g., *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 632-633.) Thus, we disregard League's and public agencies' unsupported claims. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1406.)

League and public agencies also contend the " 'draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded.' " Their contention stops there, offering no supporting

36

analysis.  The Guidelines section to which they cite requires recirculation of an EIR when a disclosure is added to the EIR that shows the draft was fundamentally and basically inadequate and conclusory in nature.  (Guidelines, § 15088.5, subd. (a)(4).)  League and public agencies do not point to such a disclosure that was added to the EIR.  Earlier in their briefs, under a different heading, League and public agencies argued the department failed to disclose relevant information in the EIR, including the negotiation of the coordinated operations addendum, unspecified 2018 legislative developments, new unspecified developments related to a Delta conveyance, and findings from a 2018 state climate change assessment.  League and public agencies do not contend a disclosure was added to the EIR revealing this information.  Further, they make no effort to describe this information or how it renders the draft EIR inadequate and conclusory.  Thus, we deem the contention forfeited.  (See *Keyes, supra*, 189 Cal.App.4th at pp. 655-656; see also *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [where EIR challenged as legally inadequate, court presumes agency's decision to certify the EIR was correct, imposing on the challenging party the burden of establishing otherwise].)

Alliance asks us to find a different recirculation deficiency, specifically in the department's response to comments concerning the Table A Amount reduction alternative.  As discussed *ante*, the draft EIR states that the department considered but rejected an alternative that would have reduced Table A Amounts.  The department received criticism for this rejection during the public comment period.  In the final EIR, the department described these comments as "reflect[ing] a misunderstanding of the calculation and delivery of [State Water Project] water under the [c]ontracts."  The department attempted to resolve the misunderstanding by providing additional analysis, explaining as follows:  "In the interests of providing more information to decision makers and the public on the effects of this scenario, [the department] has prepared an analysis of the effects of reducing [State Water Project] water supplies.  This analysis is not presented as an alternative or as a modification of any alternatives discussed in the [draft

37

EIR], but as clarification of why [the department] rejected the approach as an alternative."

In that analysis, the department described two possible scenarios to reduce Table A Amounts and forecasted the effects of those reductions. Alliance contends the inclusion of this analysis in the final EIR foreclosed public participation and informed decision making in violation of CEQA. In support, Alliance cites a decision that was substituted by the opinion in *Save Our Capitol!, supra*, 87 Cal.App.5th 655, but provides no further analysis of the case or its application to these facts. Thus, like League and public agencies, Alliance fails to meet its burden. Moreover, an analysis of *Save Our Capitol!* reveals the lack of merit to Alliance's contention. *Save Our Capitol!* explains that recirculation is required if the new information added to the final EIR is significant new information. (*Save Our Capitol!, supra*, 87 Cal.App.5th at p. 706.) New information is not significant unless "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (*Ibid.*; Guidelines, § 15088.5, subd. (a).) New information that clarifies or amplifies the previously circulated draft EIR does not require recirculation. (*Save Our Capitol!, supra*, 87 Cal.App.5th at p. 706; Guidelines, § 15088.5, subd. (b).) The discussion the department added did not disclose a new environmental impact of the project or an increase in the severity of an impact. (See *East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1266.) At most, this information clarified or amplified the Table A Amount reduction alternative that the department rejected. (See *ibid*.)

II

Delta Reform Act

The Delta Reform Act was enacted in 2009 in response to a crisis concerning the Delta and California's water infrastructure. (*Delta Stewardship Council Cases, supra*, 48 Cal.App.5th 1014, 1028; Special Session Proclamation (Sept. 11, 2007); see Wat. Code, § 85000 et seq.) It created the Delta Stewardship Council (council) as an independent agency of the state and charged it with adopting and implementing a legally enforceable "Delta Plan." (Wat. Code, §§ 85200, 85300, subd. (a).) The Delta Plan is a comprehensive, long-term management plan for the Delta that furthers the "coequal goals" of (1) providing a more reliable water supply for California and (2) protecting, restoring, and enhancing the Delta ecosystem. (Wat. Code, §§ 85054, 85059, 85300, subd. (a).)

A state agency that proposes to undertake a "covered action" must prepare a written certification of consistency with the Delta Plan, before initiating the implementation of the covered action, with detailed findings as to whether the action is consistent with the Delta Plan and then submit that certification to the council. (Wat. Code, § 85225.) Within the Delta Reform Act, Water Code section 85075.5 defines a covered action as a plan, program, or project that meets specified criteria and is not subject to an exemption. (Wat. Code, § 85075.5.)

Here, the department did not consider the amendments to be a covered action and, as a result, did not prepare a certification of consistency with the Delta Plan. Alliance and public agencies contend this was error. In their view, the amendments constitute a covered action requiring such certification.[16] On independent review, we disagree. (See

---

[16] Public agencies also assert that the department must comply with a broader suite of laws protecting the Delta spanning six decades. This assertion is forfeited because it is not identified in a separate heading and is not supported with argument or authority. (See

39

*Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 978-979 [standard of review].)

Viewing the statutory scheme as a whole, we make four observations. (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106-1107.) First, Water Code section 85022, which includes findings, policies, and goals regarding the Delta Reform Act, states that "[e]xisting developed uses*, and future developments that are carefully planned and developed consistent with the policies of this [act],* are essential to the economic and social well-being of the people of this state." (Wat. Code, § 85022, subd. (c)(4), italics added.) This phrasing suggests the Delta Reform Act's focus is on "future developments" and not existing developed uses. Second, a covered action must "occur . . . within the boundaries of the Delta or Suisun Marsh." (Wat. Code, § 85057.5, subd. (a)(1).) Thus, a covered action is an action that physically takes place in the Delta or the Suisun Marsh. Third, a covered action must have a significant *impact* on either providing a more reliable water supply for California or protecting, restoring, and enhancing the Delta ecosystem. (Wat. Code, § 85057.5, subd. (a)(4).) And fourth , a covered action does not include routine maintenance and operation of the State Water Project. We need not decipher the precise meaning of the phrase "routine maintenance and operation of the State Water Project" here. It suffices to note the Legislature's clear intent to exempt the existing State Water Project from a covered action.

Applying these observations, we conclude the amendments are not a covered action. The amendments extend the terms of existing contracts with State Water Project contractors and expand the department's ability to use revenue bonds to finance betterments to State Water Project facilities and new State Water Project facilities that

_____

*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179; *Keyes, supra*, 189 Cal.App.4th at pp. 655-656.)

achieve a certain approval threshold.  Thus, we agree with the department that the amendments do not physically occur in the Delta.  Also, the amendments do not change the developed uses of the State Water Project.  The extension amendment does not expand the existing operations of the State Water Project, and the revenue bond amendment is not the same as the future projects that will use revenue bond funds to construct betterments and improvements or new facilities.  Thus, there was no error in the department's decision not to prepare a certification of consistency with the Delta Plan.

III

Public Trust Doctrine

Network and Alliance contend the department violated its duty of continuing supervision under the public trust doctrine when approving the contract amendments. From the limited scope of the amendments, we discern no public trust violation.

The public trust doctrine recognizes that "the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." ' " (*Nat. Audubon Soc. v. Super. Ct. of Alpine Cty.* (1983) 33 Cal.3d 419, 434 (*National Audubon*).)  *National Audubon* provides the foundation for California's public trust doctrine, specifically as applied to water resources.  The case concerned water rights that the City of Los Angeles had obtained through the predecessor to the State Water Resources Control Board (we refer to that board and the State Water Resources Control Board as the water control board) in the 1940s.  (*National Audubon,* at p. 424.)  In 1979, environmental organizations sued to enjoin the city from exercising those rights, specifically from diverting the stream flows that supplied water to the Mono Lake Basin, arguing that the diversion violated the public trust by harming fish, wildlife, and recreation.  (*Id*. at p. 431.)  The case was removed to federal court, where the district court stayed its proceedings under the federal abstention doctrine to allow California courts to resolve the relationship between the water rights system and the public trust doctrine.  (*Id*. at pp. 431-432.)  The plaintiffs then filed a claim for declaratory relief in

41

state court as to that issue, and the court entered summary judgment against them, finding that the public trust doctrine did not function independently of the water rights system. (*Id*. at pp. 432-433.) The plaintiffs filed a petition for mandate with the California Supreme Court. (*Id.* at p. 433.)

The California Supreme Court reversed the trial court's decision. The Court concluded that the public trust doctrine protects navigable waters from harm caused by diversion of nonnavigable tributaries and that a grantee of water rights holds those rights subject to the public trust. (*National Audubon, supra*, 33 Cal.3d at p. 440.) Thus, the public trust doctrine applied to Los Angeles's rights to divert water from the streams at issue and that doctrine operated as a potential limitation on both new and established water rights. The Court thereby resolved the plaintiffs' request for declaratory relief, but it did not terminate or reduce the city's stream diversions. Obtaining such reductions required additional years of litigation ending in a solution negotiated by the city and a Mono Lake environmental group and adopted by the water control board. (Arnold, *Working Out and Environmental Ethic: Anniversary lessons from Mono Lake* (2004) 4 Wyo. L. Rev. 1, 15 (*Arnold*).)

Network and Alliance contend the department failed to perform the affirmative duty established by *National Audubon* in approving the amendments. One passage of *National Audubon* describes that duty as follows: "the state has an affirmative duty to take the public trust into account in the planning and allocation of water resources." (*National Audubon, supra*, 33 Cal.3d at p. 446.) But a closer reading of *National Audubon* indicates that the Supreme Court was specifically concerned with approvals of water diversions. The Court summarized its holding as follows: "[B]efore state courts and agencies *approve water diversions* they should consider the effect of such diversions upon interests protected by the public trust, and attempt, so far as feasible, to avoid or minimize any harm to those interests." (*Id.* at p. 426, italics added.) This closer reading is significant because the department does not approve water diversions – that task is

42

performed by the water control board.  In fact, *National Audubon* recognized the water control board's "charge of comprehensive planning and allocation of waters."  (*Id*. at p. 444.)  Thus, the duty described in *National Audubon* to consider the public trust in the "planning and allocation of water resources" belongs to the water control board.

Although there may be circumstances in which that affirmative duty also belongs to other state agencies, including the department, we conclude that the amendments do not present such circumstances.  The determinative fact is whether the amendments have an impact on "water that is imbued with the public trust." (*Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 859, 861.)  Our review of the department's determination is "limited to determining whether the [department's decision] was arbitrary, capricious, or entirely lacking in evidentiary support, or whether it failed to follow appropriate procedures.  [Citation.]  We do not reweigh the evidence, substitute our judgment for that of the [department], or inquire into the soundness of the [department's] reasoning.  [Citation.]"  (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 509.)  There is no procedural matrix for determining compliance with the public trust doctrine.  (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 234 (*Baykeeper*).)

The record supports the department's conclusion that the amendments do not impact a public trust resource.  The water rights issued to the department for the State Water Project were granted by the water control board in 1967 and have been amended by that board several times.  (See, e.g., Water Control Board Decision Nos. 1275 (1967) [1967 WL 6285], 1379 (1971) [1971 WL 134907], 1485 (1978) [1978 WL 21149], 1641 (2000) [1999 WL 1678482].)  The contracts giving contractors interests in those water rights were executed in the 1960s and allow contractors to extend their interests indefinitely.  Operating under this framework, the department reached the reasoned conclusion that extending the terms of the contracts to 2085 would have no impacts, not only compared to the CEQA baseline but also compared to the alternative of not

43

proceeding with the amendments. The department also reached the reasoned conclusion that while the revenue bond amendment broadened the availability of an existing financing mechanism, it would have no environmental impact because the use of that mechanism is too speculative. While Network and Alliance dispute these conclusions, we cannot deem them arbitrary or capricious and we cannot conclude they are lacking in evidentiary support. Nor do we discount these conclusions because they are based on findings in the EIR rather than in a separate public trust analysis. While there may be instances in which a CEQA analysis fails to analyze the breadth of potential public trust uses (see, e.g., *Baykeeper, supra*, 242 Cal.App.4th at pp. 240-243), appellants do not make that contention here.

Network makes a different argument to undermine the department's impact assessment. Network asserts that the department has a "duty of ongoing supervision" and cannot sidestep that duty by arguing that the amendments have no impact. This assertion relies on the following *National Audubon* passage: "[O]nce the state has approved an appropriation, the public trust imposes a duty of continuing supervision over the taking and use of the appropriated water." (*National Audubon, supra*, 33 Cal.3d at p. 447.) But Network takes this statement out of context. After establishing the state's affirmative duty to consider the public trust interests when planning and allocating water resources, the Court noted that the water control board, the Legislature, and the courts had never considered those interests in the case of the water rights at issue. (*Id*. at p. 447.) Those rights were granted to the City of Los Angeles in the 1940s by the water control board when the board "believed it lacked both the power and the duty to protect the Mono Lake environment." (*Ibid*.) The Court held the granting of water rights did not preclude the water control board (or the Legislature or courts) from reconsidering those rights in light of the public trust. (*Id*. at pp. 447-448.) It further cautioned that "some responsible body ought to reconsider the allocation of the waters of the Mono Basin." (*Id*. at p. 447.) That reconsideration required years of litigation and negotiation, culminating in the Mono

44

Lake Basin Water Right Decision 1631 issued by the water control board in 1994. (Water Control Board Decision No. 1631; *Arnold, supra*, 4 Wyo. L. Rev. at p. 22.) We do not translate the "continuing duty of supervision" described in this passage of *National Audubon* as imposing a continuing duty of supervision on the department as to the water rights with which it operates the State Water Project. In this context, the department's duty under the public trust doctrine is triggered only where it is taking an action with an impact on public trust uses. As that impact is absent here, no duty arises to weigh the public trust interests or consider additional protections to those interests.

IV

Appellants' Other Arguments Against Validation

A. *Prematurity*

Where authorized by statute, a public agency may bring a validation action to establish the validity of its actions. (Code Civ. Proc., §§ 860-870.5.) Government Code section 17700 authorizes a state agency to bring an action to determine the validity of its contracts that "are in the nature of, or directly relate to the . . . agency's bonds." (*California Commerce Casino, Inc. v. Schwarzenegg*er (2007) 146 Cal.App.4th 1406, 1429.) Thus, the contracts subject to a validation action under Government Code section 17700 "involve financing and financial obligations of the state." (*Id*. at p 1422, fn. 15.)

Public agencies contend the trial court neglected to address their position that the department's validation action is premature. In their view, this contention was independent from their argument that the department improperly segmented the amendments under CEQA. We disagree. Public agencies essentially contend validation is improper if we do not consider how the amendments connect with other projects the department may have in mind in the future. This is the segmentation contention we rejected above.

45

Moreover, the contention lacks merit even when considered separately under the validation statute. A validation judgment is conclusive against the agency as to all matters adjudicated therein or which at that time could have been adjudicated. (Code Civ. Proc., § 870, subd. (a).) We decline to give weight to public agencies' fear that the validation judgment will produce a "Pandora's Box" of conflicts over its reach. Public agencies cite no authority holding prematurity or uncertain reach of a validation judgment as a valid defense to validation. Their citation to *Westlands Water District v. All Persons Interested, etc., et al.* (2023) 95 Cal.App.5th 98 by way of "Notice of Additional Authority" filed after the conclusion of briefing (Cal. Rules of Court, rule 8.254) does not fill this gap in authority. In *Westlands*, the reviewing court affirmed the trial court's dismissal of an action to validate a contract on the grounds that the contract was materially deficient in failing to specify Westlands Water District's financial obligations. The material deficiency of a contract is not synonymous with the prematurity of a validation action, and public agencies do not contend the amendments are materially deficient.

The statutory scheme itself defeats public agencies' contention. There are only 60 days in which to bring a validation or reverse validation action. (Code Civ. Proc., § 860.) "[A] central theme in the validating procedures is speedy determination of the validity of the public agency's action." (*Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1497.) "A key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially." (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843.) " 'The fact that litigation may be pending or forthcoming drastically affects the marketability of public bonds.' " (*Ibid.*) Public agencies' construction renders the 60-day period uncertain (potentially never starting) and the central purpose of speedy determination elusive.

B.    *Compliance with Burns-Porter Priorities*

The State Water Project has been partly financed by general obligation bonds issued under Burns-Porter.  (*Coachella Valley Water Dist. v. Superior Court* (2021) 61 Cal.App.5th 755, 761.)  Under Burns-Porter, bondholders lent the department millions in funds to construct the State Water Project on promise of repayment.  (*Ibid*.)  That repayment was secured by revenue from the contractors – public agencies with taxing authority – in exchange for allowing those agencies to participate in the State Water Project.  (*Ibid*.)

Burns-Porter specifies that revenues derived from the sale, delivery, or use of water or power from the State Water Project must be deposited in a special fund and used for certain purposes in a specified order of priority.  (Wat. Code, § 12937, subd. (b).)  The top priority is the payment of the reasonable costs of the annual maintenance and operation of the State Water Project and the replacement of any parts of the State Water Project.  (Wat. Code, § 12937, subd. (b)(1).)  Public agencies contend the amendments – specifically the extension amendment and the revenue bond amendment – fail to reconcile with this statutorily-required first priority.  We disagree.  Nothing on the face of the amendments negates this first priority and nothing in this opinion deems Water Code section 12937 satisfied as to the use of any revenues from the State Water Project.[17]

C.    *Compliance with Water Code Section 147.5*

Public agencies contend the trial court erred in finding the department met the requirements of Water Code section 147.5.  We disagree.

---

[17]    Having reached this conclusion, we need not address public agencies' related concern that the department lacked the information to determine whether it complied with Water Code section 12937 because it did not provide the Legislature an annual budget report required under Water Code section 147.  We also reject for the same reasons above public agencies' related contention that the department did not meet its burden of proof as to compliance with Water Code section 12937.

47

Water Code section 147.5 applies to the renewal or extension of a long-term water supply contract between the department and a contractor. At least 60 days before final approval of the renewal or extension, the department must present, at an informational hearing before the Legislature, the details of the terms and conditions of the contract and how they serve as a template for the remaining long-term water supply contracts. (Wat. Code, § 147.5.) The informational hearing must be made to the Joint Legislative Budget Committee (joint committee) and the relevant policy and fiscal committees of both houses. (*Ibid*.) At least 30 days before the hearing, the department must submit a copy of one long-term contract to the joint committee. (*Ibid*.)

Public agencies contend the department failed to satisfy this statute because it submitted only draft amendments and not the final version of the amendments following review of EIR public comments. On independent review, we conclude public agencies demand more than Water Code section 147.5 requires. (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 20 [standard of review].) The statute requires the department to make a presentation to certain legislative committees at least 60 days before a contract is approved. The statute does not contemplate that the contract is in its final form when it is presented to the committee. The informational hearing might present concerns to the department that compel it to seek additional changes to the amendments. We do not read the statute to require the department to participate in an additional hearing as to those changes. The goal of Water Code section 147.5 is to provide high-level oversight into the renewal or extension of State Water Project long-term contracts, but not to insert such oversight into the details of finalizing the renewal or extension. Public agencies' effort to combine the review required by Water Code section 147.5 and the EIR process is unpersuasive.

Public agencies also find deficiency in the department's presentation at the oversight hearing because the department did not mention that it had received but not yet responded to public comments to the EIR. Again, public agencies read too much into the

48

statute. The statute does not require the department to provide the details regarding an EIR. Moreover, when seeking the legislative hearing, the department indicated that a draft EIR had been prepared and that a final EIR would be completed in the future. This was sufficient to inform the legislative committees as to the department's progress in the EIR process.

Because we conclude the department complied with Water Code section 147.5, we reject public agencies' related contention that the department failed to meet its burden of proof as to compliance with section 147.5.

D.    *Other Existing Contract Terms*

Network contends the amendments cannot be validated because they reaffirm provisions of the existing contracts that cannot be performed. In Network's view, (1) the water delivery amounts in the contracts are, and have always been, impossible or impractical to satisfy, (2) the amendments essentially reauthorize those amounts, and (3) the reauthorization of such impossible or impracticable terms is unconscionable. A similar claim was made and rejected by this court in *Central Delta, supra*, 69 Cal.App.5th at page 204. There, the appellant argued that the authorization of a contract amendment reauthorized the entire contract. (*Ibid*.) But the appellant provided no support for such a sweeping proposition. (*Ibid*.) Such support is also lacking here. Network offers no authority allowing us to reach the water delivery provisions of the contracts. In reply to respondent's opposition noting the lack of authority, Network still offers none, conceding that its contention is unusual. We agree with the trial court's refusal to entertain Network's reauthorization contentions. Thus, we need not address Network's specific impossibility, impracticability, or unconscionability arguments. The department's request for judicial notice of an April 2023 notice it sent to contractors is denied as immaterial. (See *Appel, supra*, 214 Cal.App.4th at p. 342, fn. 6.)

E.      *The Department's Authority to Adopt the Amendments*

Public agencies appear to contend validation of the amendments confers "absolute power" on the department to assume "unbounded" contracts. The analysis supporting this contention is unpersuasive.

The trial court found the department acted within its general, broad contracting authority concerning the State Water Project in approving and executing the amendments. Public agencies do not dispute this general authority. (See, e.g., Wat. Code, §§ 12937, subd. (b) [authorizing the department to enter into contracts for the delivery of State Water Project water subject to conditions prescribed by the Legislature], 11454, subd. (b) [authorizing department to do all things necessary, convenient, or expedient].) And public agencies do not explain how validation of the amendments confers absolute authority on the department to assume unbounded contracts. This validation action is limited to contracts that are in the nature of, or directly relate to, the department bonds. (Gov. Code, § 17700; *California Commerce Casino, Inc. v. Schwarzenegge*r, *supra*, 146 Cal.App.4th at pp.1429-1430.)

Public agencies assert the department overread a 1963 California Supreme Court decision, *Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, to support its contracting authority and the trial court should have corrected their overreading. In public agencies' view, *Marquardt* does not provide a "free pass for agencies to base decision-making on an assumption of continuing or expanding 'paper water' deliveries from the State Water Project [citation omitted], or to flout the statewide policy to reduce reliance on water deliveries from the Delta." We do not interpret the department as seeking such a free pass nor do we provide one here. Public agencies overread the department's validation action and our holding.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

/s/_____
MESIWALA, J.

We concur:

/s/_____
MAURO, Acting P. J.

/s/_____
WISEMAN, J.*

---

\*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.